**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | | |
|---|---|---|
| **CRYSTAL BAKER,** <br> 8011 Circle Road <br> Whaleyville, MD 21872 <br> *Plaintiff,* <br><br> v. <br><br> **WAL-MART STORES EAST, LP,** <br> 409 N. Fruitland Blvd. <br> Salisbury, MD 21801 <br>  **Serve Resident Agent:** <br>   The Corporation Trust, Incorporated <br>   2405 York Road, Suite 201 <br>   Lutherville Timonium, MD 21093 <br><br> *Defendant.* | * <br> <br> * <br> <br> * <br> <br> * <br> <br> * <br> <br> * <br> <br> * <br> <br> * <br> <br> * | <br><br><br><br> CIVIL CASE NO.:_____ |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**COMPLAINT**

Plaintiff Crystal Baker through counsel makes this Complaint against her former employer, Wal-Mart Stores East, LP ("Walmart"), for race discrimination and retaliation, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ("Title VII"), and § 20-606 of the State Government (S.G.) Article of the Maryland Annotated Code ("MFEPA") and for retaliation under the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"). Ms. Baker seeks declaratory and injunctive relief, awards of compensatory and punitive damages, and an award of attorneys' fees and costs.

1

## JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that this action asserts violations of rights secured by the laws of the United States. This Court has supplemental jurisdiction over Ms. Baker's state claims, which are pendant to her federal claims.

2. Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b), as the events giving rise to the claim occurred in the District of Maryland, and there is no other district in which this action may be brought.

3. Prior to bringing this action, Ms. Baker timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation. The EEOC issued Ms. Baker a Notice of Right to Sue dated May 12, 2021, a copy of which is attached as **Exhibit A**. She files this suit within ninety (90) days of the issuance of the Notice.

## PARTIES

4. At all times relevant to this Complaint, Ms. Baker, a White female, was an employee of Walmart and a resident of Worcester County, Maryland.

5. Walmart is a Delaware corporation that owns and operates thousands of stores nationwide. Walmart was Ms. Baker's "employer" as defined by Title VII, the FMLA, and MFEPA.

## FACTS COMMON TO ALL COUNTS

6. Ms. Baker began working at the Walmart in Fruitland, Maryland ("Store") February 17, 2000 as an hourly associate. In 2001, she was promoted to Area Manager, and later that year, promoted again to Assistant Store Manager.

7. In close to twenty years working for Walmart, Ms. Baker earned uniformly good evaluations, rarely called out sick, and was disciplined only once for a minor infraction.

8. In November 2018, Tanya Adams-Justice, an African-American female, became Manager of the Store and, consequently, Ms. Baker's new direct supervisor.

9. In January 2020, Ms. Baker took three weeks of protected FMLA leave following a five-day hospitalization for a serious medical condition. Ms. Baker subsequently returned to work on February 1, 2020, having recuperated from her sudden illness.

10. While Ms. Baker was on FMLA leave, the Store had several District and Regional "walks," which revealed issues to be corrected. A "walk" is when upper management at either the District or Regional level inspects the Store to ensure it is in compliance with standards. Walks are meant to be remedial, rather than punitive.

11. On February 15, a week after Ms. Baker had returned from FMLA leave, Ms. Adams-Justice called a meeting with Ms. Baker and blamed her for the issues noted during the walks, most of which were caused by inadequate staffing.

12. Ms. Adams-Justice was aware that Ms. Baker had been on FMLA leave during the walks, but nonetheless blamed her for the Store's failures and charged her with fixing them.

13. Four days after their meeting, Ms. Adams-Justice called Ms. Baker into a second meeting to interrogate her about why the issues had not been resolved.

14. Ms. Baker had worked just one day since their February 15 meeting and the staffing issues, which had been ongoing for the duration of Ms. Baker's FMLA leave, could not be resolved in a single shift.

15. Ms. Baker pointed out that inadequate staffing had been a recurring issue and that Ms. Adams-Justice, as Store Manager, played a role in ensuring that the Store was properly staffed.

16. The following week, Ms. Adams-Justice tasked Ms. Baker and her White male co-worker, Robin Kennedy, with conducting interviews for the Customer Availability Process ("CAP") Team referred to as "CAP 2 Associates."

17. CAP 2 Associates are responsible for unloading merchandise from trucks and separating food from general merchandise.

18. Ms. Adams-Justice told Ms. Baker she needed to interview five candidates.

19. Historically, interviews at the Store were scheduled during the day and, consequently, they were conducted by day-shift managers.

20. Ms. Baker and Mr. Kennedy worked overnight and, therefore, did not usually conduct interviews.

21. Because Ms. Baker and Mr. Kennedy were unfamiliar with the interview process, they enlisted the help of Amy Titus, the Store's Personnel Manager.

22. Ms. Baker learned Walmart's interview protocols from Ms. Titus, and conducted three of the four interviews with Mr. Kennedy. (One candidate did not show).

23. Ms. Baker had a conflict with the fourth scheduled interview in that she had to meet with the overnight associates at that same time to hand out their assignments. Mr. Kennedy conducted that interview on his own.

24. Shortly thereafter, on February 27, Ms. Adams-Justice met with Ms. Baker to "coach" her about not conducting all five CAP 2 Associate interviews herself and claimed (falsely) Ms. Baker had conducted only one interview.

25. A "coaching" is considered discipline under Walmart's policy and stays in an employee's personnel file for a year.

26. Ms. Baker believed Ms. Adams-Justice's "coaching" was unwarranted and unfair. With the assistance of Mr. Kennedy or Ms. Titus, Ms. Baker had conducted three of the five assigned interviews (with one candidate being a "no show").

27. Immediately following her meeting with Ms. Adams-Justice, Ms. Baker submitted a written rebuttal to the coaching. Ms. Baker also emailed Tracy Lanham, Walmart's Human Resources Director, to request "open door coaching" for Ms. Adams-Justice and herself given the series of issues that had arisen since Ms. Baker had returned from FMLA leave.

28. On March 8, Ms. Adams-Justice called Ms. Baker into her office and presented her with her first ever poor evaluation.

29. Ms. Adams-Justice "cautioned" Ms. Baker that Walmart had recently fired a number of managers "because of their bad evaluations."

30. According to Ms. Adams-Justice, Walmart no longer accepted rebuttals or responses to evaluations and instructed Ms. Baker not to respond.

31. Ms. Baker did not heed Ms. Adams-Justice's instruction and emailed Ms. Adams-Justice the following day, March 9, disputing her evaluation.

32. That same day Ms. Baker also contacted Walmart's Ethics Hotline to report that Ms. Adams-Justice was discriminating against her because of her race. Since Ms. Baker had returned from FMLA leave, Ms. Adams-Justice had written Ms. Baker up for issues outside of Ms. Baker's control, given Ms. Baker an unwarranted negative review, and threatened Ms. Baker with termination. Ms. Baker was aware of another White employee who had taken FMLA leave since Ms. Adams-Justice had become Store Manager and Ms. Adams-Justice had reassigned that White employee all closing shifts upon her return from leave. On the other hand, if an African American employee called out of work, even if it was not for a serious medical condition, Ms. Adams-Justice

took no adverse action against them and actually changed their schedule to reflect the absence as a day off from work so they could avoid discipline.

33. Ms. Baker presented to the Hotline examples of how she and other White coworkers were treated worse than the African-American managers and supervisors in the Store, such as routinely denying White employees' requests for paid time off, but consistently granting requests for paid time off made by African-American employees, and offering African-American managers better shifts and providing them with more staffing than their White counterparts. Ms. Baker also informed the Hotline that, since Ms. Adams-Justice had been Manager of the Store, she had promoted fifteen African-American workers to management or supervisory positions, compared to promoting only four White workers to similar positions, and had forced at least three White supervisors to quit because of mistreatment.

34. On March 10, Ms. Lanham denied Ms. Baker's "open door coaching request." According to Ms. Lanham, Ms. Baker needed to contact the Associate Hotline – a resource reserved for hourly employees, not salaried employees like Ms. Baker – to make a complaint. Ms. Lanham told Ms. Baker it would be bad for employee morale if Ms. Baker pursued open door coaching with her office.

35. Unwilling to drop the matter, Ms. Baker called the Associate Hotline March 11.

36. On March 16, Ms. Adams-Justice called Ms. Baker on her day off and demanded Ms. Baker come in for a "one-on-one meeting."

37. Ms. Baker did not respond because she was off from work and because she believed Ms. Adams-Justice would use the occasion to bully her.

38. On March 28, Ms. Adams-Justice moved Ms. Baker from the overnight to day shift effective April 1, but did not provide a reason for doing so.

6

39. Ms. Baker had been working overnights for the last four years and had specifically requested the overnight shift so that during the day she could care for family members with serious medical conditions, including her sister who was battling cancer, her aunt who had dementia, and her son who needed spinal surgery.

40. Ms. Adams-Justice was aware Ms. Baker worked overnights because she was caring for her family during the day, but transferred Ms. Baker anyway and with no reason for doing so.

41. Around that same time, Ms. Baker received a call from a member of the Associate Hotline, who informed Ms. Baker that her February 27 coaching as well as her bad evaluation would stand without change.

42. Apparently, the Associate Relations team had interviewed Ms. Adams-Justice; Andre L'Heureux, Walmart's District Manager, who is White; and Limark Tucker, Walmart's Market Manager, who is African American, about Ms. Baker's complaint.

43. On April 7, Ms. Baker emailed Mr. L'Heureux to request a meeting to discuss her complaint against Ms. Adams-Justice.

44. Mr. L'Heureux responded he needed a few weeks to "research it."

45. Shortly thereafter, Walmart moved three of Ms. Baker's African-American coworkers – Ms. Adams-Justice, Bobbie Siggers, and Rashawn Yopp – to different stores. (Ms. Baker had named Ms. Siggers and Mr. Yopp in her complaint of discrimination against Ms. Adams-Justice by providing examples of how Ms. Adams-Justice had given them preferential treatment).

46. Mr. L'Heureux then dismissed Ms. Baker's complaint claiming it was moot because Ms. Adams-Justice was no longer Ms. Baker's supervisor.

47. Ms. Baker insisted Mr. L'Heureux investigate her complaints because, despite the fact Ms. Adams-Justice was no longer her supervisor, the discriminatory write-up and bad evaluation remained in her file.

48. Having heard nothing further, Ms. Baker emailed Mr. L'Heureux once again on May 30. That email was also ignored.

49. After Ms. Baker persisted in her complaint, Mr. L'Heureux began scheduling walks of Ms. Baker's department more frequently and at times when Ms. Baker was scheduled off from work.

50. Mr. L'Heureux held Ms. Baker accountable for any issues he found during the walks, even though the majority of the issues were caused by inadequate staffing, which had grown worse with the COVID-19 pandemic.

51. Mr. L'Heureux directed Ms. Titus to hire associates for certain areas and departments, but never instructed Ms. Titus to hire associates for Ms. Baker's department forcing that responsibility solely on Ms. Baker in addition to her many other job opportunities.

52. Ms. Baker was the only Assistant Manager at the Store forced to do her own hiring.

53. Ms. Baker was also the only Assistant Manager at the Store who was not supplied with additional help when her department needed it; this ran contrary to Walmart's "Blitzing" policy, which dictates that, if an area is in need of assistance, a team from another department is sent to help.

54. Ms. Baker's assigned department was food and grocery, which was extremely busy during the pandemic.

55. On July 18, Ms. Baker was issued a second "coaching" by her new supervisor, Chris Hitchens, who confessed he was effectuating orders from Mr. L'Heureux in disciplining Ms. Baker.

56. According to the July coaching, Ms. Baker's department needed to improve rotation, freshness, and cleaning standards.

57. Ms. Baker's department could not keep up with the historically high demand, which was caused by the pandemic and made worse with extraordinarily low staffing levels. Walmart provided no support of Ms. Baker, in violation of its own Blitzing policy, because Mr. L'Heureux wanted Ms. Baker to fail.

58. From August 15 through August 21, Ms. Baker was on vacation.

59. Mr. L'Heureux toured the Store on August 21 and again found issues with Store rotation, freshness, and cleaning standards.

60. On August 24, Ms. Baker reported to work early at 6:00 a.m., and toured the area with her department manager in which they discussed what needed to be done that day.

61. At 7:00 a.m. that morning, Mr. Hitchens toured Ms. Baker's department and found out-of-date Chub-Meat; this was on Ms. Baker's department manager's list to complete that morning, but she had not been able to get to it.

62. More significantly, it was an issue that could and should have been addressed on Ms. Baker's day off, but was not.

63. On August 29, Mr. Hitchens terminated Ms. Baker, but did not give a reason for her termination.

64. According to Mr. Hitchens, Mr. L'Heureux had made the decision to fire Ms. Baker and he was carrying out Mr. L'Heureux's orders.

65. Mr. L'Huereux terminated Ms. Baker because she had complained of discrimination and insisted he investigate her complaint even after Walmart transferred Ms. Adams-Justice.

66. At the time of Ms. Baker's termination, she was 57 years old and was helping to support her ailing family. Despite the fact Ms. Baker had only attended school through the tenth grade, Ms. Baker was earning roughly $75,000 a year working for Walmart. Ms. Baker's discriminatory and retaliatory termination has been devasting for Ms. Baker emotionally, physically, and financially. Ms. Baker is now working to obtain her GED, but her hope of finding employment on the lower Eastern Shore earning a comparable salary is nonexistent.

## CAUSES OF ACTION

### COUNT I
### RETALIATION UNDER TITLE VII AND S.G. § 20-606

67. The facts alleged above are incorporated by reference.

68. Ms. Baker made protected complaints of race discrimination against Ms. Adams-Justice, who, in turn, harassed and retaliated against her for making those complaints.

69. Ms. Adams-Justice knew Ms. Baker had complained to corporate about her discriminatory treatment, and retaliated against Ms. Baker by issuing Ms. Baker a negative review and transferring Ms. Baker to the day shift because Ms. Baker had complained.

70. Mr. L'Heureux then retaliated against Ms. Baker by unfairly scrutinizing Ms. Baker's work, failing to provide Ms. Baker with the support she needed to complete her job, and terminating Ms. Baker for persisting with her complaint of discrimination, despite the fact Walmart had removed Ms. Baker from Ms. Adams-Jones' supervision.

**WHEREUPON**, Ms. Baker respectfully requests this Honorable Court grant the following relief:

A.     Enter a judgment in favor of Ms. Baker and against Walmart for compensatory damages in the form of past <u>and</u> future lost salary and fringe benefits;

B.     Enter a judgment in favor of Ms. Baker and against Walmart for punitive damages;

C.     Enter a declaratory judgment holding that Walmart violated Ms. Baker's rights under the laws of the United States;

D.     Assess reasonable attorneys' fees and costs of suit in favor of Ms. Baker and against Walmart; and

E.     Grant Ms. Baker such other and further relief as the nature of her cause may warrant.

<u>**COUNT II**</u>
<u>**RACE DISCRMINATION UNDER TITLE VII S.G. § 20-606**</u>

71.    The facts alleged above in paragraphs 1 through 65 are incorporated by reference.

72.    Before her improper termination, Ms. Baker was subjected to unwelcome and offensive race-based behavior that was sufficiently severe and pervasive to alter the terms and conditions of employment.

73.    Ms. Adams-Justice's actions in disciplining Ms. Baker for issues outside of Ms. Baker's control, issuing Ms. Baker an unwarranted poor performance review, and transferring Ms. Baker to the day shift, were motivated by Ms. Baker's race and because Ms. Baker had taken protected leave under the FMLA. (Ms. Adams-Justice allowed African American employees to call out of work or miss work without any adverse consequences).

74.    Ms. Adams-Justice did not apply Walmart's policies and procedures fairly and consistently; instead, Ms. Adams-Justice illegally made decisions based upon race.

75. Ms. Baker was qualified for her position, as evidenced by her previously unblemished record with Walmart. Ms. Baker was also performing her job satisfactorily. To the extent there were any issues found at the Store, they were not properly attributable to Ms. Baker, as they either occurred while she was off, before she had adequate time in her shift to address them, or because she was not given the support she needed to complete her job.

**WHEREUPON**, Ms. Baker respectfully requests this Honorable Court grant the following relief:

A.  Enter a judgment in favor of Ms. Baker and against Walmart for compensatory damages in the form of past and future lost salary and fringe benefits;

B.  Enter a judgment in favor of Ms. Baker and against Walmart for punitive damages;

C.  Enter a declaratory judgment holding that Walmart violated Ms. Baker's rights under the laws of the United States;

D.  Assess reasonable attorneys' fees and costs of suit in favor of Ms. Baker and against Walmart; and

E.  Grant Ms. Baker such other and further relief as the nature of her cause may warrant.

## COUNT III
## FMLA RETALIATION

76. The facts alleged are incorporated by reference.

77. Ms. Adams-Justice willfully and in bad faith retaliated against Ms. Baker for taking FMLA leave as described above.

**WHEREUPON**, Ms. Baker respectfully requests this Honorable Court grant the following relief:

A.  Declare Walmart violated Ms. Baker's rights under the FMLA;

12

B.Enter judgment in favor of Ms. Baker and against Walmart for compensatory damages in the form of back salary with fringe benefits from the date of her termination through trial;

C.Order Walmart to reinstate Ms. Baker, or, in lieu thereof, enter judgment in favor of Ms. Baker and against Walmart for compensatory damages in the form of future lost wages with fringe benefits commencing from the date of trial and extending for a reasonable period into the future;

D.In addition to the foregoing actual damages, award Ms. Baker liquidated damages in an amount equal to her actual damages;

E.Assess reasonable attorneys' fees and costs of suit in favor of Ms. Baker and against Walmart; and

F.Award Ms. Baker prejudgment and post-judgment interest on her actual damages, liquidated damages, and attorney's fees; and

G.Grant Ms. Baker such other and further relief as the nature of her cause may warrant.

/s/
ROBIN R. COCKEY, Federal Bar No.02657
ASHLEY A. BOSCHÉ, Federal Bar No. 28800
Cockey, Brennan & Maloney, PC
313 Lemmon Hill Lane
Salisbury, MD 21801
410-546-1750
Fax:  410-546-1811
rrcesq@cbmlawfirm.com
bosche@cbmlawfirm.com
*Attorneys for Plaintiff*